**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**SHARON ELLZEY**                                    **CIVIL ACTION**

**VERSUS**                                           **NO. 08-4081**

**MARLIN GUSMAN,**                                   **SECTION "C" (3)**
**SHERIFF OF ORLEANS PARISH**


**OPINION**[1]

    This matter was tried before the Court without a jury on April 7, 2011, and taken under advisement. Having considered the evidence adduced at trial, the record, the memoranda of counsel, and the law, the Court finds in favor of Defendant, Marlin Gusman ("Gusman") and against Plaintiff, Sharon Ellzey ("Ellzey").

    Ellzey brought three separate claims against Gusman, the Sheriff of Orleans Parish: (1) Violation of the Fair Labor Standards Act ("FLSA"), for the denial of overtime pay caused by her supervisor allegedly altering her time records; (2) Violation of Title VII of the Civil Rights Act of 1964 ("Title VII") for alleged sexual harassment by a co-worker; and (3) Violation of the Americans with Disabilities Act ("ADA") for the failure of the Sheriff's Office to accommodate her migraine headaches, anxiety, and depression through a transfer to another office, as well as for alleged disability-based harassment by her supervisor.

---

[1]Max Weiss, a second-year student at Tulane University Law School, assisted in preparing this Opinion.

### I. Background

After a previous term of employment, Ellzey was employed as a purchasing agent in the Orleans Parish Sheriff's Office ("Sheriff's Office") in June 2004.  Exh. 1 at 47.  Ellzey testified that her main duties included receiving requisition forms from personnel in the Sheriff's Office, reviewing  them, and obtaining three price quotes for the items or services to be presented to her supervisor.  (Rec. Doc. 58 at 7, 60, 84).  Once approved, her job was then to order the products and make sure that they were received.  *Id*. at 7, 60, 84.  She was transferred to the Maintenance Department of the Sheriff's Office ("Maintenance Department") in 2005.  *Id*. at 19.   In the Spring of 2006, David Payton ("Payton") began supervising Ellzey in the Maintenance Department. *Id.* at 170.  After Payton's arrival, Ellzey claims she began noticing that she wasn't getting paid for the extra hours she worked or for her work on Saturdays.  *Id.* at 12.

Ellzey claims she was diagnosed with migraine headaches in 2000, and that they began occurring more frequently as a result of, among other work and domestic-related factors,  harassment from Payton regarding her job performance.  *Id*. at 19, 20.  In October 2006, Ellzey was involved in a violent dispute with her domestic partner, who had threatened to kill her.  Exh. 8 at 1.  On October 5, 2006, the boyfriend entered the Maintenance Department facility where Ellzey and others were working, and after repeated requests to leave the premises, was arrested by Sheriff's Office personnel.  *Id.*  Ellzey claims that Payton would joke about seeing the boyfriend on the premises, which made her very anxious.  (Rec. Doc 58 at 33-34).  Payton denies this allegation.  *Id.* at 176. Ellzey claims that this harassment caused her migraines to become more frequent and caused her to develop depression and anxiety, all of which adversely affected her work performance and day-to-day abilities.  *Id.* at 34-35.  Ellzey made several requests to Payton to transfer her to another

department, which were denied. *Id.* at 31-32. Payton testified that the facility was secure, that it was completely fenced off and contained security cameras, and that the site housed Sheriff's Office personnel. *Id.* at 174-175. After the incident with the boyfriend, Payton testified he installed an additional lock on the back door of the office. *Id.* at 176. Another violent domestic incident occurred with the same boyfriend in April of 2007. Exh. 8 at 1 ,2. In two letters to Gusman dated June 7 and November 9, 2007, Ellzey made requests to transfer to another facility based on her stress related to Payton's supervisory methods, the incident with her boyfriend, and her migraines. Exhs. 3, 4.

In 2006, Lieutenant Michael Pittman ("Pittman") arrived at the Maintenance Department as a foreman. (Rec. Doc. 58. at 15, 179). His main duty was to supervise the construction crews in the field. *Id.* at 179-80. Ellzey alleges that Pittman would frequently make inappropriate sexually suggestive remarks to her and create inappropriate sexual situations, which occurred until the last day of her employment at the Maintenance Department. *Id.*. at 25. Ellzey claims that on numerous occasions Pittman would call her into his office to watch women dancing on BET[2] and make comments about the types of women's bodies he liked, *Id.* at 24; that Pittman would make comparisons between her body figure and his wife's, *Id;* and that Pittman called her into his office on numerous occasions to view pornography on his computer. *Id.* at 26-27. Pittman kept an icebox in his office in which he allowed Ellzey to keep water. Ellzey claims that every time she bent over to take a bottle, she noticed Pittman was leaning back in his chair watching her. *Id.* at 25. Pittman allegedly made an inappropriate sexual comment regarding entering the bathroom while Ellzey was in it, and another regarding helping her pull-up the zipper on her jeans. *Id.* at 67-68. Finally, after

---

[2] "Black Entertainment Television"

Pittman had lent Ellzey $1,500 to be repaid in $50 increments, Exh. 5,  Ellzey alleges that Pittman suggested that she could satisfy the entire loan by "doing for him what his wife was not doing," i.e. sex.  (Rec. Doc. 58 at 85).

During the time of Ellzey's employment in the Maintenance Department, a co-worker, Keishon Stephens ("Stephens"), filed a sexual harassment complaint regarding Pittman.  *Id.* at 78. During the investigation, Ellzey gave statements to Internal Affairs but omitted any mention of Pittman sexually harassing her as well.  *Id.*  On April 24, 2008, Ellzey met with Chief William Short ("Short"), the person in charge of receiving sexual harassment complaints at the time.  *Id.* at 130- 132.  At this meeting, Ellzey presented to Short two letters, one from a social worker at Therapy Support Services and the other from Ellzey's primary care doctor at Janus Medical Group, Inc.  *Id.* at 131; Exh. 9 at 2-3.  The letter from a social worker dated three months previous, stated that Ellzey was subjected to trauma at her job caused by her supervisor's refusal to transfer her to a safer office and "blatent sexual harassment."  Exh 9 at 2. The letter also stated that this trauma was causing Ellzey to have panic and anxiety symptoms leading to frequent migraines.  *Id.*  As further support, the letter from the doctor stated that Ellzey had been diagnosed with depression, anxiety, acute stress disorder, and migraines, all of which were affecting her job performance.  *Id.* at 3.   When asked if she wanted to file a complaint, Ellzey declined.  (Rec. Doc. 58 at 131).  Ellzey also met with Robert Martin ("Martin"), whose duties in the Sheriff's Office included assisting employees who were having personal or work problems.  *Id.* at 145.  Martin testified that in their several meetings, Ellzey never made a complaint about being sexually harassed by another employee.  *Id.* at 145, 149, 155. Gusman also testified that in his meeting with Ellzey she did not mention sexual harassment.  *Id.* at 160-161.  Ellzey resigned from the Sheriff's Office in June 2008.

## II. Law & Analysis

### I. *FLSA Claim*

Ellzey claims that Payton had altered her time records to show that she had not worked overtime, in particular, for the hours she worked on Saturdays.  (Rec. Doc. 20-4 at 2; Rec. Doc. 58 at 12-17).  The FLSA requires payment of overtime compensation for work in the excess of forty hours per week.  29 U.S.C. § 207(a)(1).  However, there are exceptions to this general requirement for employees "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C.  § 213(a)(1).  The issue in this claim is whether Ellzey was employed in a "bona fide administrative capacity" and thus exempt from the FLSA's overtime compensation provisions under 29 U.S.C. § 213(a)(1).  If this Court holds that Ellzey was not exempt, the next question is whether Ellzey's employer –  in this case, her supervisor, Payton – did in fact deny her overtime compensation by altering her time cards.  The Court need not address the first question regarding Ellzey's exemption status.  Even assuming *arguendo* that Ellzey was not exempt under §213(a)(1) and thus entitled to overtime compensation, the record does not support a finding that Payton altered Ellzey's time records to deny her overtime compensation.

Defendant presented testimony by Juliet Langham ("Langham"), the comptroller for the Sheriff's Office whose duties include supervising the Office's payroll system.  (Rec. Doc. 58 at 102).  Langham testified on how an employee in the Office checks in and out, and stated in unequivocal terms that a supervisor in Payton's position could not access the payroll system and alter records.  *Id.* at 103, 111.  Langham also testified at length about what the Office considers overtime and how an employee obtains overtime.  She explained that overtime is based on hours

worked, not hours paid.[3]  *Id.* at 104.  Langham testified that after having reviewed most of Ellzey's payroll records, she did not see anything that would indicate that Ellzey was entitled to any additional pay other than what she was paid.  *Id.* at 109.  Langham testified that all overtime hours had to have been pre-approved by a supervisor, in this case, Payton.  *Id.* at 111.  If overtime was not pre-approved, then Payton would send payroll a memo stating that he had not authorized the overtime and to adjust the hours accordingly.  *Id.*  Nothing in the record indicates that  there were "non-approval memos" by Payton to cancel Ellzey's overtime pay.  *Id. at* 114-116; See Exh. 4. After October 25, 2007, the payroll system was changed, and in order for Payton to have approved overtime pay, he needed to enter an affirmative approval into the payroll's computer system.  *Id.* at 118.  Langham further testified that Payton was an "excellent" record keeper, and that he was "one of the better watch commanders" in terms of accuracy and due diligence.  *Id.* at 111.

Payton also provided credible and persuasive testimony regarding the nature of overtime pay available to employees in the department.  *Id.* at 183-185.  Payton explained that "ninety-nine point nine percent of all the overtime was going to be on the craftsman side," i.e., for the workers (plumbers, electricians, etc.) on the sites.  *Id.* at 185.  Payton further testified that most of the work performed by Ellzey, such as purchasing, was done during the week.  *Id.* at 193.  She would have needed Payton's permission to work on Saturday for overtime, and Payton testified that he did not remember her ever asking him for such a request.  *Id.* at 192-193.

Ellzey provides little more than a bare assertion that Payton altered her time records, particularly for Saturdays, to deny her overtime pay.  However, overtime under the FLSA is based

---

[3] For example, if someone worked 45 hours but 8 of those hours were sick time or annual leave, then they would not be entitled to overtime.  *Id.*

upon weekly hours worked, not the days of the week worked.  29 U.S.C. § 207(a)(1).  For purposes

of overtime pay calculations under the FLSA, the mere fact that Ellzey worked on Saturdays is

irrelevant.  Defendant, on the other hand, through the testimonies of Langham and Payton, provided

credible and persuasive evidence that Payton did not, or could not alter Plaintiff's time records as

Plaintiff alleges. Nothing in the record indicates that Ellzey was entitled to any additional pay other

than what she was paid.  Therefore, her FLSA claim fails.

II. <em>Title VII Sexual Harassment Claim</em>

Ellzey alleges that she was subjected to sexual harassment by her co-worker, Pittman.  (Rec.

Doc. 20-4 at 2).  Sexual harassment is a form of employment discrimination prohibited by Title VII.

*Simmons v. Lyon*, 746 F.2d 265, 270 (5th Cir. 1984).  To establish a prima facie claim for sexual

discrimination based on a theory of a hostile work environment, the plaintiff must show the

following:

> "(1) The employee belongs to a protected group, i.e., a simple stipulation that the employee
> is a man or a woman;
>
> (2) The employee was subject to unwelcome sexual harassment, i.e., sexual advances,
> request for sexual favors, and other verbal or physical conduct of a sexual nature that is
> unwelcome in the sense that it is unsolicited or uninicited and is undesirable or offensive to
> the employee;
>
> (3) The harassment complained of was based upon sex, i.e., that but for the fact of her sex,
> the plaintiff would not have been the object of harassment;
>
> (4) The harassment complained of affected a "term, condition or privilege of employment,"
> i.e., the sexual harassment must be sufficiently pervasive so as to alter the conditions of
> employment and create an abusive working environment;
>
> (5) Respondent superior, i.e., that the employer knew or should have known of the
> harassment in question and failed to take prompt remedial action."

*Jones v. Flagship Intern.,* 793 F.2d 714, 719-20 (5th Cir. 1986).  Ellzey satisfies the first three

7

elements: (1) she is a woman; (2) she was subject to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct sexual in nature; and (3) the alleged harassment was based upon the fact that she was the opposite and desired sex of Pittman. The fourth and fifth elements prove more troublesome for Ellzey. For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21-22 (1993). This is determined by examining the totality of the circumstances. *Id.* at 23. Such factors to consider may include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 82 (1998). The conduct must be severe or pervasive to amount to a change in the terms or conditions of employment and create an abusive working environment. *Shepherd v. Comptroller of Public Accounts of the State of Texas,* 168 F.3d 871, 874 (5th Cir. 1999) *(*citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). The effect on the employee's psychological well-being is relevant in determining whether the plaintiff actually found the environment abusive. *Harris,* 510 U.S. at 21-22. But while psychological harm may be taken into account, no single factor is required. *Id*

As drawn from Ellzey's testimony, the allegations are as follows:

1. On multiple occasions Pittman called Ellzey into his office to watch women dancing on his television and made comments about women's body types he liked. (Rec. Doc. 58 at 24).

8

2. Pittman would make comparisons between Ellzey's body figure and his wife's, such as stating "I got two big women" - referring to both Ellzey and his wife.  *Id.*

3. On one occasion, Pittman called Ellzey into his office for help removing a pornography site frozen on his computer screen.  On several other occasions, Pittman called Ellzey into his office to show pornographic images of people in different sexual positions "that he liked."  *Id.* at 24, 26-27.

4.  Pittman kept an icebox in his office  in which he allowed Ellzey to keep water.  Every time she bent over to take a bottle, she noticed Pittman was leaning back in his chair watching her, "aroused." (*Id*. at 25).

5. Pittman allegedly made inappropriate sexual comments regarding entering the unisex bathroom while Ellzey was in it. (" 'If [I] walk in[to] the bathroom, [I'm] gonna get me m[ine].'") *Id.* at 67; Pittman also made an inappropriate comments regarding another worker helping Ellzey pull-up the zipper on her jeans.  ("'Oh no', he didn't want her to zip it up because he sa[id] 'anything dealing with me [was] his job, he should be the one to do it.'")  *Id.* at 68.

6. Pittman had lent Ellzey $1500 to be repaid in $50 increments.  Exh. 5.  When Ellzey fell behind on her payment schedule Pittman suggested that she could satisfy the entire loan by "doing for him what his wife was not doing", i.e. sex.  (Rec. Doc. 58 at 85).

Taken together, these allegations which occurred over a roughly two-year period, if assumed to be true, demonstrate that Pittman was a crass and insensitive co-worker with little concept of appropriate work-place etiquette.  However, this Court will not determine whether this behavior constitutes a Title VII violation.  Assuming *arguendo* that Pittman's conduct did indeed affect a term, condition, or privilege of Ellzey's employment, Ellzey's claim cannot prevail since she did

not present persuasive evidence that Gusman knew or should have known of the harassment in question and failed to take prompt remedial action. *Jones,* 793 F.2d at 720. Once informed of allegations of sexual harassment, a company that takes prompt remedial action to protect the claimant may avoid Title VII liability. *Nash v. Electrospace Sys., Inc.,* 9 F.3d 402, 402 (5th Cir. 1993). "'Prompt remedial' action must be 'reasonably calculated' to end the harassment." *Skidmore v. Precision Printing and Packaging, Inc.,* 188 F.3d 606, 615 (5th Cir. 1999) (quoting *Jones,* 793 F. 2d at 719-20). What constitutes prompt remedial action depends on the facts of the case. *Hockman,* 407 F.3d at 329 (citing *Skidmore,* 188 F.3d at 615). A claimant cannot prove that an employer failed to take prompt remedial action where the claimant unreasonably failed to take advantage of corrective opportunities provided by the employer. *Hockman,* 407 F.3d at 330 (citing *Woods v. Delta Beverage Group*, *Inc.,* 274 F.3d 295, 300, 301 (5th Cir. 2001)).

For example, in *Hockman,* the court held that the plaintiff could not prove that her employer failed to take prompt remedial action when (1) she received an employee handbook containing the company's antiharassment policy; (2) the policy provided that if the employee does not feel that her allegation was being handled satisfactorily by her supervisor, she should report the incident directly to the Director of Human Services; (3) she acknowledged the receipt of the handbook and understanding of its provisions with her signature; and (4) despite her awareness, the plaintiff did not avail herself of any of the company's provisions several months after the harassment began. 407 F.3d at 329-30. The court reasoned that plaintiff could not succeed in her claim because she failed to take advantage of available corrective opportunities provided by her employer. *Id.* at 330.

Here, the Sheriff's Office had a written sexual harassment policy that was distributed to all employees, including Ellzey. Exh. 1; (Rec. Doc 58 at 62). Furthermore, all employees, including

10

Ellzey, received classroom training about the sexual harassment policy.  (Rec. Doc. 58 at 63, 129).
The policy provides in detail the procedure and mechanism for filing sexual harassment complaints,
as well as specifying which personnel are responsible for receiving and responding to the
complaints.  Exh. 1.   Ellzey experienced firsthand the procedures as well as the efficacy of this
policy when she made statements regarding Pittman in a sexual harassment investigation involving
a co-worker.  In fact, Ellzey admitted not disclosing Pittman's harassment of her when she was
questioned about Stephens' sexual harassment complaint against Pittman.  (Rec. Doc. 58 at 78).  She
stated several times that she didn't want to get Pittman in trouble.  *Id.* at 44, 75, 78.  Indeed, she
testified favorably that Pittman was understanding about her health issues and her complaints about
Payton.  *Id.* at 65, 68.  He also loaned her $1,500 when she was financially in need.  *Id.*  According
to Payton and Ellzey's higher-ups in the Sheriff's Office  with whom she met to discuss her work
problems, Ellzey never mentioned that Pittman sexually harassed her. The first undisputed mention
of sexual harassment came during a meeting with Short on April 24, 2008, just two months before
Ellzey resigned.  (Rec. Doc. 58 at 130-32).   Furthermore, when asked if she wanted to file a
complaint, Ellzey declined.  *Id.* at 131.  Both Martin and Gusman testified that in their meetings with
Ellzey, she did not mention sexual harassment.  *Id.* at 145, 149, 160-61.  All provided persuasive
testimony that Ellzey did not make an official complaint of sexual harassment or identify Pittman
as the actor, and that had she done so, the proper measures were in place to effectively deal with the
situation.[4] Despite her awareness of her employer's sexual harassment policy, Ellzey did not avail

---

[4]As a result of Keishon Stephen's complaint against Pittman, an investigation was
performed and he was found guilty of sexual harassment.  He was sent to sensitivity training and
received a suspension.  He was ultimately terminated from the Maintenance Department for
verbally harassing another female employee.  (Rec. Doc. 58 at 133-134).

herself of its provisions at any of several opportunities.  Therefore, Ellzey cannot prove that her employer failed to take prompt remedial action.

Ellzey alleges that since Pittman was arguably her supervisor, the employer, Gusman, should be vicariously liable.  *Faragher,* 524 U.S. at 780; *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998).  When a supervisor or a person with higher authority harasses the employee, the employee need not provide proof of *respondeat superior.  Watts v. Kroeger Co.,* 170 F.3d 505, 509 (5th Cir. 1999).  Apparent authority suffices, that is, when the employee is mistaken about the harasser's authority, the mistake must be a reasonable one.  *Burlington,* 524 U.S. at 759.  Here, Payton was Ellzey's supervisor, not Pittman.  (Rec. Doc. 172).  Payton testified that Pittman was not Ellzey's supervisor, that he had no authority to fire, discipline, or transfer Ellzey, nor did he have the authority to approve her overtime.  *Id.* at 180.  Pittman's title of "lieutenant" came from his position in law enforcement, not his position in the Maintenance Department.  *Id.*  Ellzey argues that since Pittman wore his insignia on his work shirt, and that Ellzey was of a lower "rank", she was reasonably mistaken about his authority over her.  (Recs. Doc. 58 at 190; 56 at 2).

The Court need not address the issue of whether Ellzey was "reasonably mistaken" about Pittman's authority.  Even if Gusman was found to be vicariously liable, Ellzey's claim would still fail.  Under *Faragher* and *Burlington,* a defendant employer may raise two affirmative defenses to vicarious liability: (a) that the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  524 U.S. at 807; 524 U.S. at 765.  As discussed *supra,* the Court finds that Ellzey did not wish to pursue a sexual harassment claim against Pittman.  Despite her first-hand knowledge of

12

the procedures, she failed to utilize the opportunities provided by the Sheriff's Office's sexual harassment policy.  So again, Ellzey's claim of sexual harassment would fail.

Ellzey's sexual harassment claim fails on multiples levels.  First, even if Pittman's alleged behavior met the Title VII requirements for discrimination, Ellzey did not prove that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  By her own admission, she didn't pursue the remedies offered under the employer's sexual harassment policy.  Furthermore, Pittman was not her supervisor, but even if he was, her employer would not be vicariously liable for the same reasons as discussed *supra* – i.e., her failure to mitigate the hostile work environment through the utilization of an effective grievance mechanism.  Therefore, Ellzey's Title VII claim fails.

### III. *ADA Claims*

Ellzey claims that Payton subjected her to disability harassment by taunting her based on her fear of her abusive boyfriend, and failed to accommodate her disability by refusing to  transfer her to a more secure office.  (Rec. Doc. 20-4 at 4).  Ellzey began receiving treatment for Post-Traumatic Stress Disorder ("PTSD") in December of 2007, and had previously received counseling for recovery from domestic violence.  Exh. 9 at 1-3.  Her traumatic and abusive relationship with her ex-boyfriend, in conjunction with the stresses of work, including the alleged harassment by Payton, allegedly caused her to have increased migraines, depression, and anxiety.  *Id.* at 1-3; (Rec. Doc. 58 at 34-35).  Ellzey alleges that these impairments adversely affected her work attendance and performance, as well as her daily abilities to concentrate, sleep, or bathe.  *Id* at 1-3; (Rec. Doc. 58 at 34-35).

The ADA prohibits employers from discriminating against qualified individuals who have

13

a disability.  Specifically, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009).   In order to succeed in a claim under the ADA, a plaintiff must make a *prima facie* showing that (1) she was disabled; (2) she was qualified for the job about which her claim(s) revolve;(3) because of her disability, she was the subject of an adverse employment action; and (4) she was treated less favorably that other non-disabled individuals.  *Burch v. Cola-Cola Co.,* 119 F.3d 305, 320 (5th Cir. 1997).  Ellzey must demonstrate that she is not merely suffering from a physical or mental impairment, but that she is disabled within the meaning of the ADA. *Toyota Mfg. Kentucky, Inc. v. Williams,* 534 U.S. 184, 195 (2002).

The ADA defines "disability" as:

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; or

(B) a record of such an impairment; or

(C) being regarded as having such an impairment."

42 U.S.C. § 12102(1) (2009).  "Major life activities" refers to those activities that are of central importance to daily life. *Toyota*, 534 U.S. at 197.  Such activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(a)(2009). "Whether a disability is substantially limiting depends on: (1) the nature of the severity of the impairment; (2) its duration or expected duration; and (3) its permanent

14

or expected or long-term impact." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (citing 29 C.F.R. § 1630. App., § 1630.2(j)). In contrast, "temporary, non–chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities." *EEOC. v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 619 (5th Cir. 2009) (citing 29 C.F.R. § 1630(2)(j)). The Supreme Court explained "substantially limited" to mean an inability to perform a major life activity that members of the general population are capable of performing. *Toyota,* 534 U.S. at 198. For an impairment to be substantially limiting to the life activity of work, it must "significantly restrict [the individual's] ... ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Aldrup v. Caldera*, 274 F.3d 282, 286-87 (citing 29 C.F.R. § 1630(j)(3)(I)). The mere inability to perform any job at one specific location is not a substantial limitation. *Id.* at 287-88.

Caselaw demonstrates that the 5th Circuit generally does not consider work-related anxiety and depression a disability under the ADA. *Id.* at 287. For example, in *Aldrup v. Caldera*, the court held that the plaintiff was not disabled when he allegedly suffered from depression caused by "the stress and anxiety of having to work with certain employees" at a particular fire station. *Id.* The court reasoned that this claim merely tended to show that the plaintiff was unable to perform any job at one particular location, and not of his inability to perform a broad class of jobs. *Id.* The plaintiff submitted as evidence of his disability a letter from a physician concluding that he has "a medical condition that substantially limits one or more of his life activities...", but the court entitled this little evidentiary weight. *Id*

By contrast, in *EEOC v. Chevron Phillips Chemical Co.,* the court found the plaintiff to be severely limited in the major life activities of caring for herself, sleeping, and thinking as she was

15

unable to live on her own, cook for herself, shop for food, zip up her own clothes, use the bathroom without assistance, was unable to remember her own son's name on occasion, slept only one or two hours a night, and had concentration problems that caused her to miss exits while driving.  570 F.3d at 615, 617.  Additionally, her treating physician indicated that her substantial limitation would be permanent.  *Id.* at 609.

Here, Ellzey's facts are very similar to those in *Aldrup*.  274 F.3d at 287.  Like the plaintiff in *Aldrup*, who suffered from depression and anxiety from the stress of working with certain people at a certain location, Ellzey suffered from depression, anxiety, and migraines related to working with Payton and Pittman at the Maintenance Department office.  *Id.*; (Rec. Docs. 20-4 at 2-4; 58 at 34-35).  Additionally, like the plaintiff in *Aldrup* whose ultimately insufficient central evidence of substantial limitation consisted of a letter from a physician, here, Ellzey's central evidence consists of two letters from a social worker and a letter from a physician attesting to her disability.  Exh. 9 at 1-3.  In contrast, Ellzey's impairment is not nearly as severe as the plaintiff's in *EEOC*.  570 F.3d at 617.  While migraine headaches certainly inhibit one's functional ability, they do so when one has an episode of a migraine.  In a June 2007 letter to Gusman, Ellzey wrote that she suffered from "at least one - two attacks each month."  Exh. 3.  In her testimony, she claimed that she missed up to seven days of work in June 2007.  (Rec. Doc. 58 at 85).  While the results of Ellzey's depression and anxiety, such as "just lay[ing] there",  not taking a bath, combing her hair, or cleaning her apartment for days, as well as the diminished attendance and work performance are serious and debilitating, they do not rise to level of severity, duration, or permanence required to be considered a substantially limiting disability under the ADA.  (Rec. Docs. 58 at 34-35; 20-4 at 2-4).

A. *Disability-Based Harassment*

16

Assuming *arguendo* that the Court were to consider Ellzey's condition a disability within the meaning of the ADA, Ellzey's claims of both disability-based harassment and failure to accommodate would still fail.  A cause of action for disability-based work place harassment under the ADA is modeled after a similar claim under Title VII.  *Flowers v. S. Reg'l Physician Servs., Inc.,* 247 F.3d 229, 234-35 (5th Cir. 2001).  To succeed in this claim, Ellzey must demonstrate that (1) she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.  *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 509 (5th Cir. 2003) (citing *Flowers,* 247 F.3d at 235-36).  The legal standard for workplace harassment is high.  *Id.* For a harassment claim under the ADA to become actionable, the disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.  *Flowers*, 247 F.3d at 236.

First, as explained above, Ellzey fails to demonstrate a disability within the meaning of the ADA. Second, Ellzey provides no evidence of Payton's alleged disability-based harassment beyond her own testimony.  Such specific allegations of disability-based harassment  are absent from her June 7 and November 9, 2007, letters to Gusman requesting a transfer, as well as from the letters from her social worker and physician. Exh. 3; 4; 9 at 1-3.  Payton denies ever taunting Ellzey about seeing her abusive ex-boyfriend on the premises.  *Id.* at 176.  As with her FLSA claim, which was unsubstantiated and diametrically opposed to credible testimony to the contrary, here, Ellzey's claims regarding Payton's alleged disability harassment are also diametrically opposed to Payton's testimony to the contrary.  *Id.*  This Court does not find Ellzey's testimony credible.

Third, even assuming that the alleged disability-based harassment occurred, it was not sufficiently pervasive or severe to create a hostile work environment.  *Flowers*, 247 F.3d at 236.  The alleged hurtful and  insensitive comments to Ellzey regarding her abusive ex-boyfriend and his presence on the premises do not meet the high standards set by *Flowers*.[5]  *Id.*; *See* Rec. Doc. 58 at 30, 33, 202.   For example, in *McConathy v. Dr. Pepper/Seven-Up Corp.,* the court found that an employer's behavior, such as criticizing the slow pace of the plaintiff's recovery from joint disease, insensitivity toward her need for surgery, reassigning work away from her, exclusion from business meetings, and refusal to acknowledge her presence, while insensitive and rude, was not sufficient for establishing a harassment claim.  131 F.3d 558, 560, 563-64 (5th Cir. 1998).  The court reasoned that it is a "simple fact that in the workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or 'cold shouldering' to the level of actionable offense."  *Id.* at 564.

Conversely, in *Flowers v. S. Reg'l Hosp. Sys.,*the court found an employer's conduct to be sufficiently severe and pervasive to create a hostile work environment when after discovering that the employee had contracted HIV, the employee's supervisor ceased all socializing with the employee, intercepted her telephone calls, eavesdropped on her conversations, refused to shake her hand when "the two used to get along very well."  247 F.3d at 236-37.  The plaintiff was subjected to increased random drug tests, including four in one week.  *Id.* at 237.  In addition, the plaintiff, who had previously received outstanding performance assessments, was "written up" twice and placed on probation.  *Id.*  The supervisor also called the plaintiff a "bitch" during a meeting.  *Id.*

---

[5]Ellzey even testified that "in the beginning [the harassment] was petty..."  (Rec. Doc. 58 at 20).

18

The plaintiff became distressed enough to carry around a tape recorder while at work.  *Id.*  Here, the alleged comments made by Payton, such as stating that he thought  he just saw the ex-boyfriend or asking if he had beaten Ellzey again, while cruel and insensitive if they occured, would not reach the requisite level of severity or pervasiveness to bring a disability-harassment claim under the ADA.  These comments are far less severe as those in *Flowers* and arguably, as those in *McConathy.*

Fourth, Ellzey cannot prove that the employer knew or should have known of the harassment and failed to take prompt remedial action.  Ellzey's complaint to her higher-ups of her alleged disability as well as the alleged disability-based harassment  was withheld in a similar manner as her alleged claim of sexual harassment.  In her June 7, 2007 letter to Gusman, Ellzey states that she was diagnosed with migraines and that she essentially doesn't get along with Payton – that "his supervisory methods and work ethic have proven to be too stressful for [her] condition and [herself]."  Exh. 3.  In her November 9, 2007, letter to Gusman, Ellzey makes similar complaints as well as the accusation that Payton told a new employee about her domestic abuse situation.  Exh. 4.  Both letters begin with a paragraph detailing her status and qualifications based on a newly-acquired advanced degree.  Exh. 3; 4.  The first time Ellzey presented anything documenting her alleged disability and its correlation with Payton's behavior occurred at a April 24, 2008, meeting with Short, where she submitted to him a recently written note by her physician.  Exh. 9 at 3.  Because this single notification occurred less than two-months before Ellzey resigned, she cannot prove that Gusman failed to take remedial action.  Therefore, Ellzey's claim for disability-based harassment fails.

B. *Failure to Accommodate*

Assuming once again that this Court were to consider Ellzey's condition a disability within the meaning of the ADA, Ellzey's claim of failure to accommodate would still fail. Assuming Ellzey was disabled, she must prove that her employer failed to reasonably accommodate her. *Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 315 (5th Cir. 2007) (citing 42 U.S.C. 12112(b)(5)(A)). Ellzey's claim focuses on the failure of the Sheriff's Office to transfer her to a more secure area, a request based on her fear and anxiety related to her abusive ex-boyfriend entering the premises. Rec. Doc. 20-4 at 3. Yet, the record supports a finding that Ellzey's safety was not a real issue while she worked at the location in question. Payton testified at length regarding the physical layout of the Maintenance Department building. (Rec. Doc. 58 at 174-79). According to his testimony, the entire facility was fenced off and had security cameras. *Id.* at 174. Additionally, the area also housed many Sheriff's Office personnel. *Id.* at 174-75. The ex-boyfriend was in fact arrested by Sheriff's Office personnel when he refused to leave the premises, which was the very incident that Ellzey claims spawned her fear associated with this location. Exh. 8 at 1; (Rec. Doc 20-4 at 3). Furthermore, Payton testified that after this incident, he responded by adding an additional lock to the facility's back door. (Rec. Doc. 58 at 177). Since the record indicates that the Maintenance Office facility was a safe location for Ellzey to work, and her supervisor took measures to make the premises even more secure, Ellzey did not prove that her employer failed to accommodate her. Therefore, Ellzey's claim of failure to accommodate fails.

### III. Conclusion

The Court does not doubt that Ellzey suffered from stress and anxiety, and has undergone significant turmoil related to her domestic and work environments during the times in question. But

Ellzey has failed to provide persuasive evidence that she was denied payment to which she claims to have been entitled under the FLSA.  Even if Ellzey demonstrated that she was subject to sexual harassment actionable under Title VII, her claim still cannot prevail due to her failure to utilize known and effective procedures provided by the Sheriff's Office.  Finally, Ellzey failed to demonstrate that she has a disability under the meaning of the ADA.  Even if she could demonstrate such a disability, the alleged disability-based harassment, if it occurred at all, does not reach a sufficient level of severity to be actionable under the ADA.  Since the facility at which Ellzey worked was shown to be secure, her claim of failure to accommodate cannot prevail.

Accordingly,

IT IS ORDERED that judgment be entered in favor of Defendant, Marlin Gusman, Sheriff of Orleans Parish, and against Plaintiff, Sharon Ellzey.

New Orleans, Louisiana, this 29th day of June, 2011.


**HELEN G. BERRIGAN**
**U.S. DISTRICT COURT JUDGE**